| | | |
|---|---|---|
| In re: Gray Matter Holdings Inc., | ) | Chapter 11 |
| | ) | |
| Debtor in Possession. | ) | Case No. 23-41366 |
| | ) | |
| | ) | Judge Tiiara N.A. Patton |
| | ) | |
| | ) | |

---

### DEBTOR'S BRIEF IN OPPOSITION TO OBJECTIONS TO ADMISSION OF DEBTOR'S TEMPORARY RESTRAINING ORDER EVIDENCE

---

Debtor Gray Matter Holdings Inc. respectfully sets forth the following Brief in

Opposition to Objections to Admission of the Debtor's Temporary Restraining Order Evidence:

### MR. HANDEL'S OBJECTIONS TO THE ADMISSIBILITY OF EVIDENCE MUST BE REJECTED WHEN THE COURT APPLIES THE CORRECT STANDARDS FOR ADMISSION OF EVIDENCE IN HEARINGS ON TEMPORARY RESTRAINING ORDERS OR PRELIMINARY INJUNCTIONS

The objections to the admission of the Debtor's evidence raised by Shareholder and

Creditor David Handel ("Mr. Handel") are set forth in the chart contained in the Brief filed by

Mr. Handel at Docket No. 31 (the "Handel Brief"). All of the objections raised by Mr. Handel

during the hearing on issuance of the Temporary Restraining Order conducted by the Court on

December 27 and 28 (the "TRO Hearing") are set forth as if they apply to evidence being offered

in a trial in the District Court or the Bankruptcy Court after the completion of discovery and a

briefing schedule. In this case, the procedural posture is substantially different from the ordinary

federal court trial, and federal caselaw mandates a very different approach to evidence,

including, where appropriate, the admission of hearsay and other forms of evidence that would

ordinarily be excluded.

1

The standards for admissibility of evidence in TRO proceedings are substantially different than those that apply in trials. *See, e.g., S.C. Progressive Network Educ. Fund v. Andino,* 493 F. Supp.3d 460, 465-66 (D.S.C. 2020):

("Given [the] limited purpose [of a temporary restraining order and a preliminary injunction], and given the haste that **[466]** is often necessary... [they are] customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed2d 175 (1981). "Because [the] proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grim v. Gloucester Cty. Sch. Bd.,* 822 F.3d 709, 725-26 (4th Cir. 2016), vacated and remanded on other grounds, 137 S.Ct. 1239, 197 L.Ed. 2d 460 (2017).

Similarly, the case of *Disney Enters. Inc. v. VidAngel, Inc.*, 224 F.Supp. 3d 957, 966 (C.D. Cal. 2016) holds as follows:

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. Of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). Therefore, the Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings. *See, e.g., Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). The Court is permitted to consider inadmissible evidence in deciding a motion for a preliminary injunction. *Id.* This flexibility exists because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible **[***1217]** at trial. *Id.* "While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v. City of Los Angeles,* 119 F.Supp.. 3d 1177, 1185 (C.D. Cal. 2015).

Notably, the *Disney* Court added footnote 1, applying the relaxed standard described above as follows:

"Both sides make numerous evidentiary objections. In light of the relaxed evidentiary standard for preliminary injunction proceedings, the Court need not rule on admissibility. However, the Court has considered the likely admissibility of the evidence in determining whether the Plaintiff demonstrated a likelihood of success on the merits, for purposes of the preliminary injunction. Where the Court has expressly relied on evidence that is subject to an evidentiary objection, the Court has overruled the objection."

The *Disney* case thus both articulates the correct standard and applies it to summarily dismiss evidentiary challenges at the preliminary injunction stage of the case.

In startling contrast to the extremely relaxed standard set forth in the numerous district court and court of appeals cases stemming from the *Univ. of Texas v. Camenisch* case decided by the U.S. Supreme Court, the Handel Brief cites twice, in boldface print, to the Northern District of Ohio Local Rules, Appendix K Default Standard for Discovery of Electronically Stored Information ("E-Discovery")… ***ESI shall be produced in processed volumes with production Bates-stamped image files (e.g.-PDF or TIFF), an associated load file, text files, and metadata…").*** *See* pages 6 and 13 of the Handel Brief. These references illustrate the wide gulf between the actual evidentiary standards established by case law for TRO or preliminary injunction hearings and the position adopted by Mr. Handel, which is apparently that the rules for production of documents **in discovery** should apply to emergency hearings on injunctive relief. Mr. Handel's position is completely inconsistent with the governing case law from the U.S. Supreme Court and the Court of Appeals for the Sixth Circuit, as well the holdings of virtually all federal cases considering the issue.

The U.S. Court of Appeals for the Sixth Circuit, in fact, disposed of the issue in single sentence, referencing a cite to the now-familiar *Univ. of Texas v. Camenisch* case. In the case of *In re DeLorean Motor Co.,* 755 F.2d 1223, 1230 (6th Cir 1985), the Court held: "[a] party… is not required to prove his case in full at a preliminary injunction hearing…." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 68 L.Ed.2d 175, 101 S.Ct. 1830 (1981)."[1] The *DeLorean* case is particularly useful in the case at bar, because it originated in the bankruptcy court, where the bankruptcy judge made an oral ruling on a motion for a TRO to prevent the Debtor or its agents

---

[1] In accord, and also citing the *Univ. of Texas v. Camenisch* case in adopting the relaxed standard, see *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007).

3

from disposing of the proceeds of a sale of stock of a subsidiary corporation. *DeLorean, supra,* at 1228. The Court of Appeals, in sustaining the bankruptcy court's decision, noted that the Bankruptcy Judge made findings "roughly corresponding" to each of the preliminary injunction factors, and "balanced all four factors in reaching the conclusion that preliminary relief was justified." *Id.*

In *DeLorean,* the Court of Appeals, noting that a lower court's decision on whether to grant a preliminary injunction may be disturbed only upon a finding of abuse of discretion, rejected the appellants' contention that there was not enough evidence before the Bankruptcy Court to establish a strong or substantial likelihood of success on the merits. *DeLorean, supra,* at 1228. In addition to rejecting the evidentiary challenge, the Court of Appeals held that the preliminary injunction factors are factors to be balanced, not prerequisites that must be met. *DeLorean, supra*, at 1229.

 Federal cases too numerous to list comprehensively in a summary briefing schedule recognize that the summary nature of TRO and preliminary injunction hearings mandates a very relaxed approach to the rules of evidence, including, where appropriate, the admission of hearsay or other normally inadmissible evidence.[2] Federal authority holding that standards of evidence are drastically relaxed in TRO or Preliminary Injunction hearings specifically includes at least two Sixth Circuit Court of Appeals opinions and a district court case from the Southern District of Ohio, but the Handel Brief does not include a section on standards of evidence in injunctive

---

[2] *See, e.g., Tacoma Energy, LLC v. Residential Energy Servs. Network, Inc.,* 2022 U.S. Dist. LEXIS 71164; 2022 WL 1509137 (S.D. Cal 2022); *DNC v. Bostelmann,* 447 F. Supp.3d 757, 764 (W.D.Wisc. 2020); *Int'l Brotherhood of Teamsters,* 239 F. Supp.3d 906, 911 n.3 (D. Md. 2017); *Compuserve, Inc. v. Cyber Promotions,* 962 F.Supp. 1015, 1019 (S.D. Ohio 1997).

relief cases, nor does it differentiate between discovery standards, trial level standards, or injunctive relief standards.[3]

Even a cursory review of the Handel Brief reveals the extent to which Mr. Handel's objections fail to apply under the appropriate evidentiary standards for TROs and preliminary injunctions. Six of the nine entries in the chart set forth on pages 2-3 of the Handel Brief, including, inter alia, Exhibits A, B, C, and D, which are central to the case, indicate that the objections are based in part on hearsay, which could be excluded in a full trial, but is expressly subject to admission under the relaxed standard applicable in TRO and preliminary injunction cases. Similarly, the same six entries rely in part on asserted violations of the best evidence rule embodied in Federal Rules of Evidence 1002 and 1003.

 A particularly revealing passage of the Handel Brief argues that "The Debtor and his [sic] counsel were on notice on the first day of the hearing that there was a best evidence objection to these documents. They [sic] could have produced documents in native format with metadata before the second day of the hearing to cure the objection, but failed to do so." Handel Brief, page 8, paragraph 13. It is apparent from a full reading of paragraphs 13-19, however, that nothing less than a full forensic examination of Mr. Davian's computer, containing the shareholder certificates, emails, director's resolutions, shareholder certificates and other documents in "native" format would be needed to finally put the objections raised to rest. Obviously, that type of project, which would require a forensic expert, cannot be accomplished overnight, or at all, in the context of a TRO hearing. Fortunately, nothing of the sort is required at the TRO/preliminary injunction stage. *In re DeLorean Motor Co.*, 755 F2d 1223, 1230 (6th Cir.

---

[3] Notwithstanding the expedited briefing schedule, the Handel Brief, which was filed at 11:53 p.m. on the second day of the briefing period, and bears the names of seven attorneys, lacks credibility because it fails to set forth the evidentiary standard applicable to this proceeding, as opposed to the standards applicable at full trials, and is based on the implicit (incorrect) assumption that the standards applicable to full trials apply here.

1985) ("[a] party… is not required to prove his case in full at a preliminary injunction hearing…").

"Lack of authentication" is also raised in eight of the nine chart entries on pages 2-3 of the Handel Brief. This is despite the testimony offered by Mr. Kluger and Mr. Davian concerning the documentary evidence. For, example, Paragraph 11 of the Handel Brief admits that "Mr. Davian testified during the December 2023 hearing that he created the certificates for his children and Mr. Handel, images of which appeared to be contained in Exhibits A and B." Nothing else is required to authenticate a document, especially in a TRO or preliminary injunction proceeding under the standards adopted by *DeLorean*. More extensive questioning on particulars of the documents does not somehow "unauthenticate" them, nor does the argument that the metadata provided does not indicate an author. Similarly, the suggestion that "t," perhaps Tim Hock, accessed the document, does not interfere with Mr. Davian's authentication. More extensive forays into the history of the documents, under *Camenisch* and its progeny (notably including *DeLorean)* are properly reserved for "a later trial governed by the full rigor of usual evidentiary standards," as referenced in the quoted language from *S.C. Progressive Network Educ. Fund v. Andino,* 493 F. Supp.3d 460, 465-66 (D.S.C. 2020) (supra).

The same applies to any challenges to the remaining Exhibits, all of which were identified by Mr. Kluger and Mr. Davian at the TRO hearing. If forensic analysis of native documents and copies is required, so be it, but not at a TRO hearing. The rules of evidence are not the same as the rules governing electronic discovery or the rules on evidence offered at a full-blown trial on the merits.

In conclusion, there is a time and place for rigorous application of usual evidentiary standards, but those standards are deliberately relaxed in proceedings for TROs and preliminary

injunctions. Mr. Handel's argument that the evidence proffered by the Debtor should not be admitted in this proceeding because it does not meet the exacting standards for evidence in federal district court trials or in E-Discovery is not supported by case law and should not be accepted by this Court. The evidence should be admitted under the actual standards set forth in case law governing TRO and preliminary injunction proceedings.

### MR. HANDEL IS JUDICIALLY ESTOPPED FROM CONTESTING MR. DAVIAN'S OWNERSHIP OR CONTROL OF 51% OF THE GRAY MATTER HOLDINGS INC. COMMON STOCK BY HIS VERIFIED COMPLAINT IN THE CUYAHOGA COUNTY COMMON PLEAS CASE

This Court has admitted the Debtor's Exhibit F, the Verified Complaint filed by Mr. Davian in the Cuyahoga County Common Pleas case, and in any event, would be permitted to take judicial notice of that pleading even had it not been admitted as evidence. The Verified Complaint identifies two defendants in the caption: Anthony Davian, and Anthony Davian in his capacity as trustee of one or more trust shareholders in Gray Matter Holdings Inc.

Paragraph 5 of the Verified Complaint reads as follows:

"Handel is an individual residing in Washington D.C. Handel owns forty nine percent (49%) of the shares in Holdings. Upon information and belief, Handel is a director in Holdings and Gray Data, and also the President and CEO of Holdings and Gray Data."

Paragraph 8 of the Verified Complaint reads as follows:

"Upon information and belief, Anthony Davian is an individual residing in Cuyahoga County, Ohio. Anthony Davian is the Chief Investment officer of Holdings."

Paragraph 9 of the Verified Complaint reads as follows:

"Davian Trustee is the trustee of one or more trusts which, in the aggregate, hold fifty one percent (51%) of the shares of Holdings (collectively the "Trusts"). The correct names of the

Trusts not [sic] known at this time, but upon discovery and with leave of court will be substituted as the real parties in interest."

Paragraph 17 of the Verified Complaint reads as follows:

"Holdings is governed by its corporate by-laws. A copy of Holdings' corporate by-laws is attached hereto as Exhibit 2. Handel is a 49% shareholder of Holdings. Davian Trustee is a 51% shareholder of Holdings."

Paragraph 18 of the Verified Complaint reads as follows:

"Pursuant to the by-laws, Holdings has a board of directors and officers. Upon information and belief, Handel and Anthony Davian are directors. The corporate records of Holdings and Gray Data are incomplete, at best."

Paragraph 19 of the Verified Complaint reads as follows:

"Handel is the President and CEO of Holdings and, upon information and belief, Gray Data. Anthony Davian is the Secretary and Chief Investment Officer of Holdings."

Paragraph 56 of the Verified Complaint reads as follows, in pertinent part:

"Davian Trustee remains a fifty-one percent shareholder in Holdings. Anthony Davian remains a director and officer in Holdings and Gray Data….[Remainder of Paragraph omitted].

The final page of the Verified Complaint proper, before the exhibits are attached, is the twentieth page but does not bear a page number. It reads as follows:

### **"VERIFICATION"**

"David Handel, under penalty of perjury, hereby verifies that the allegations contained in the foregoing Verified Complaint for Injunctive Relief and Damages of Plaintiffs David Handel, Gray Data Inc. and Gray Matter Holdings Inc. are true and accurate to the best of my knowledge."

Mr. Handel's signature, which he acknowledged as genuine in the TRO Hearing in this Court, appears below the verification text set forth above.

The Verified Complaint was accompanied by an ex-parte motion for a temporary restraining order, which was entered by the Common Pleas Court immediately, based on the allegations in the Verified Complaint. Given that the Verified Complaint was cast as a shareholder derivative action, stock ownership was at issue in the case, and when the Court granted the temporary restraining order, Mr. Handel succeeded in his goal of displacing Mr. Davian from control of Gray Matter Holdings Inc. Mr. Handel's success in displacing Mr. Davian from control through the TRO, which was based on the verified allegations of the Complaint, is significant, because it brings the facts of this case squarely within the elements of judicial estoppel, as recognized by the United States Supreme Court in the case of *New Hampshire v. Maine,* 532 U.S. 742 (2001) and by *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595 (6th Cir. 1982).

Specifically, Mr. Handel asserted, truthfully, in his Verified Complaint that Mr. Davian "is the trustee of one or more trusts which, in the aggregate, hold fifty one percent (51%) of the shares of Holdings (collectively the "Trusts")." Mr. Handel also asserted, truthfully, that he owns forty nine percent (49%) of the shares in Holdings. Those facts were obviously critical in a shareholder derivative action, where stock holdings are at the heart of the case. The Court of Common Pleas, in reliance on the allegations set forth in the Verified Complaint, immediately, without a hearing, granted the ex-parte TRO sought by Mr. Handel.

Although short-lived, the issuance of the TRO was the (first) successful result achieved by Mr. Handel in the Common Pleas case. It allowed him to temporarily displace Mr. Davian from control of the debtor for a period of time sufficient to destroy the ability of the corporation

to operate with positive cash flow, and to install his own team of operators of the company. Under the law of judicial estoppel, a successful and unequivocal assertion of a position (in this case, that Mr. Davian owned or controlled 51% of the shares of the Debtor, and that Mr. Handel owned the remaining 49% of the shares) bars Mr. Handel from adopting an inconsistent position in a different court—namely in the case at bar in the U.S. Bankruptcy Court.

The success enjoyed by Mr. Handel for several months (until the Court of Common Pleas eventually allowed the TRO to expire without entering a preliminary injunction) was not the only time that the assertion that Mr. Davian owned or controlled 51% of the shares while Mr. Handel owned or controlled 49% of the shares was adopted by the Court of Common Pleas. The second success came in the form of the Judgment Entry (1) Denying in Part the Defendants' Motion to Dismiss the Complaint and (2) Permitting the Plaintiffs to Supplement the Verified Complaint, signed by Judge O'Donnel of the Common Pleas Court on June 6, 2023 and filed on June 12, 2023 (Debtor's Exhibit O, which has already been admitted into evidence).

That Judgment Entry recites the assertion made in the Verified Complaint that Mr. Davian, as a trustee, owns or controls 51% of Gray Matter Holdings Inc. on pages 1-2. There is no doubt as to the source of that information; the Court specifically finds the fact to be asserted in the Verified Complaint. The Judgment Entry, on pages 5-6, denies Mr. Davian's Motion to Dismiss as to Count 4 of the Verified Complaint, and gives the Plaintiffs (including Mr. Handel) additional time to supplement the Verified Complaint with a copy of any written demand made by them on Gray Matter Holdings Inc., instead of dismissing the remaining seven counts outright.

Although this success, like the issuance of the TRO, was short-lived, it was still an example of the Court of Common Pleas relying on the unequivocal assertion of the 49-51 percent

10

split and issuing an Order in favor of the Plaintiffs, including Mr. Handel. As a result, Mr. Handel is now barred from asserting in this Court, that Mr. Davian is not the owner of 51% of the shares of Gray Matter Holdings Inc., under the doctrine of Judicial Estoppel.

**MR. HANDEL'S OBJECTIONS TO THE INTRODUCTION OF THE SHARE CERTIFICATES ISSUED TO MR. DAVIAN'S CHILDREN ARE UNDERCUT BY HIS INTRODUCTION OF CERTIFICATE NO 4 REFLECTING HIS 49% OWNERSHIP OF GRAY MATTER HOLDINGS INC. IN THE COURT OF COMMON PLEAS**

Mr. Handel's elaborate objections to the introduction of the stock certificates issued to Mr. Davian's children are undercut by his own introduction of certificate 4 for 49 shares as Exhibit 26 in the Court of Common Pleas. Attached hereto as Exhibit A is a file-stamped copy of a Brief in Opposition filed in the Court of Common Pleas by Mr. Davian's personal counsel in that case. The Brief addresses Mr. Handel's motion to amend his Verified Complaint in the Common Pleas Court, filed on August 1, 2023, to assert that Mr. Handel, as the owner of 49 shares of stock in Gray Matter Holdings inc., was the only shareholder, and that Mr. Davian actually held no interest in the company.

The Brief is important because it bears, as Exhibit A, a copy of Share Certificate No. 4, introduced by Mr. Handel as Exhibit 26 in the Common Pleas case. Also attached to the Brief as Exhibit B is a transcript of Mr. Handel's testimony in the Common Pleas case, identifying Share Certificate 4 as Mr. Handel's Exhibit 26, and testifying regarding the certificate that "Because the way I found this was that Anthony e-mailed it to me[4] and then in the e-mail it said the rest are on Slack, or this is from Slack, or something mentioning Slack." See Exhibit B to Brief in Opposition (attached as Exhibit A to this brief), page 157, lines 9-13.

---

[4] It should be noted that Mr. Handel never produced this email from Mr. Davian in any expedited discovery in the Common Pleas Case.

In other words, while fighting tooth and nail to exclude the Debtor's evidence of Stock Certificates Nos. 1, 2,and 3 of the same series on the grounds that Slack is not a reliable repository, and that the Certificates produced by the Debtor are not reliable because they contain errors as to the names of the corporate officers reflected thereon, Mr. Handel knows that he used Certificate 4, from the same series, obtained from Mr. Davian (whom he asserts is not a reliable source of documents) and acknowledging that the document came from the Slack system (which he asserts is also not a reliable or authentic source of evidence). In short, the transcript attached to the Brief in Opposition demonstrates that Mr. Handel has taken inconsistent positions in the Common Pleas Court and in this case with respect to whether copies of the stock certificates created by Mr. Davian are reliable as evidence.

The Brief in opposition attached hereto as Exhibit A also contains, as Exhibit C to that document, Mr. Davian's Affidavit dated August 15, 2023, authenticating Share Certificates 1, 2, and 3, issued to his children for 17 shares each , as well as share certificate 5 issued to Mr. Davian for 49 shares, and, finally, the voided share 4 issued to Mr. Handel in conflicting amounts of 49 shares (in the body) and 17 shares (in the upper right corner). This affidavit is important because it closes the circle on the status of the 100 shares issued at the inception of the corporation: 17 shares went to each of the three children in certificates 1, 2, and 3, respectively, and the remaining 49 shares were assigned to Mr. Handel, first in certificate 4, which was voided because the body indicated 49 shares while the upper right hand corner indicate 17 shares, and was replaced with certificate 5 to Mr. Handel for his 49 shares.

Only this sequence of share issuance makes numerical sense. Mr. Handel's resistance to the admission of evidence in this case that three certificates were issued to each of Mr. Davian's children for 17 shares each does not square with his presentation of certificate 4 (bearing the

same incorrect officer titles and signatures that he uses to attack the certificates issued to Mr. Davian's children as unreliable documents in this case) as evidence of his ownership of 49 shares of stock in the Court of Common Pleas. Moreover, this sequence is exactly what the Slack message the Debtor seeks to introduce as Exhibit B demonstrates, including the visibly voided certificate 4 on the front page, the replacement certificate (slightly harder to see above it), with the message itself from Tim Hock noting the discrepancy on share 4, and Mr. Davian's response that "Please note certificate 4 has been voided and is no longer valid. Certificate #5 is posted above and replaces cert 4 with the error. Thank you for catching that."

Moreover, the share ledger attached to Mr. Davian's affidavit as Exhibit F is the share ledger that Mr. Davian testified was maintained by Tim Hock for the company on the Slack Channel, which matches the 17, 17, 17 and 49 share distribution exactly[5]. The consistency of the documents is strong evidence that Mr. Davian's history of share issuance, as offered in his testimony in the Affidavit attached to the Brief in Opposition and in this Court, makes sense. It is equally strong evidence that Mr. Handel's depiction, in his Motion to Amend the Verified Complaint, of himself as the holder of all 49 outstanding shares of the company, with Mr. Davian owning nothing, was a completely unsupportable fabrication. Confronted with this evidence in the Common Pleas Court, the Docket reflects that the Motion to Amend was withdrawn on August 22, 2023.

---

[5] Mr. Handel focuses, in his Brief in Opposition to Debtor's Emergency Motion for TRO filed in this Case [Docket No. 20], on the argument that Mr. Davian never held shares to give to his children. See paragraphs 11 and 17. Those assertions are red herrings, designed to sew confusion in view of the filing of the gift tax return. Mr. Kluger's credible testimony in this court was that the gift tax return was filed at Mr. Handel's request to reduce the chances that Mrs. Davian would become trustee for the children in the event of a divorce. The shares were issued directly to the children, not to Mr. Davian first, which is consistent with certificates numbered 1,2,and 3.

## CONCLUSION

In determining whether evidence should be admitted in a hearing on the issuance of a TRO, courts have a fair amount of discretion, and contrary to the position taken by Mr. Handel, the rigorous standards of admissibility that apply in trials, after discovery and briefing schedules are suspended almost completely in TRO and preliminary injunction hearings. Hearsay, for example, is admissible, and the extremely relaxed standards properly applied under cases like *Disney, supra* result in questions of admissibility being more properly applied to weight. This accords with common sense: if every TRO hearing could be sidelined by the need for forensic analysis of metadata, there would soon be no more access to speedy injunctive relief.

In this case, the Court should consider the consistency of the evidence adduced by the Debtor in the documents offered. For example, the allocation of shares in the share log maintained by Mr. Hock at the inception of the company (Exhibit C) was the same as in the exhibit to the letter of August 8, 2022 that Mr. Davian testified he drafted and supplied to Mr. Handel to help him gain admission to Canada (Exhibit E) and both matched the allocation in the Ownership and Control Structure Chart signed electronically by Mr. Davian and Mr. Handel on July 8, 2022 for provision, as Mr. Davian testified, to a Bitcoin Exchange (Exhibit D).

Further, the format of certificate 4 offered as evidence exhibit 26 in the state court case was exactly the same as share certificates 1, 2, 3, and 5 offered by the Debtor in this case (Exhibit A), and the numerical sequence makes sense only when the internally inconsistent certificate 4 (17 shares in the corner; 49 shares in the body) is replaced by certificate 5 for the reasons explained in the Slack channel message offered as Exhibit B. Among the other conclusions the Court might draw from that level of consistency is that to the extent that certificates to the children are defective or unreliable as evidence, so are certificate 4 and

14

certificate 5 issued to Mr. Handel. Perhaps the more obvious conclusion is that all of the evidence offered by the Debtor with respect to share ownership matches exactly with the assertions made by Mr. Handel in his Verified Complaint (Admitted as Exhibit F): that Mr. Handel owns 49 shares (paragraph 5, and that Mr. Davian Owns 51 shares as Trustee for his Children (paragraphs 9 and 56).

It is generally accepted in life outside and inside the courtroom that consistent statements are indicia of reliability. That is a factor the Court should consider specifically in relation to FRE 1003, where a "genuine question" about the original's authenticity must be raised before challenging the admissibility of a duplicate. Here, the consistency between the evidence offered by Mr. Davian in Exhibit 26 in the Common Pleas Court (his certificate 4) and certificates 1, 2, 3, and 5 offered in this Court by Mr. Davian (Exhibit A) sharply mitigate against genuine questions about authenticity. Perhaps more importantly, the consistency of the 49/51 share split among all of the evidence offered suggests that the evidence is generally reliable.

The general reliability of the evidence, in fact, is bolstered by its divergent sources. Mr. Handel authored and verified the Verified Complaint admitted as Exhibit F, and offered certificate 4 as evidence in the Common Pleas Court, even though according to his testimony, he received the certificate from Mr. Davian in non-native format (from the Slack Channel). According to Mr. Davian, he created all of the certificates, and received the ledger from Mr. Hock through the Slack Channel. Yet all of these documents tell the same story when it comes to the numbers: Mr. Davian owns 51 shares as Trustee, and Mr. Handel owns 49 shares. In deciding what to admit and what, is anything, to exclude, the Court may well derive some certainty from the consistency of the 51/49 allocation that appears in the Verified Complaint, all of the evidence offered by the Debtor, and the certificate offered by Mr. Handel in the Common Pleas Court.

The flip side, of course, of all of that consistency is that Mr. Handel is now estopped from challenging the 51/49 split that he introduced, verified, and successfully relied upon to obtain an *ex-parte* TRO and an Order giving him an extended period in which to submit evidence of a proper written demand before his derivative action was dismissed in Common Pleas Court. It matters not that those successes were short-lived. It matters a lot that having told the story in Common Pleas that the split was 49/51, he should be allowed to challenge the evidence of that allocation offered in this Court. The integrity of the court system is protected by judicial estoppel. Mr. Handel's extreme efforts to exclude evidence in this Court of the exact allocation he verified under penalty of perjury should not be accepted by this Court.

Finally, the context of this case is critically important. The patient is on the gurney in the Bankruptcy Court emergency room, alive, but barely. There will be time and money for forensic analysis of documents, should it be necessary, only if the Debtor can be resuscitated and returned to positive cash flow. Emergency procedures necessary to do so are available in this Court only if emergency hearings move quickly and ordinary rules of evidence are relaxed, exactly as permitted by applicable case law. The Debtor therefore respectfully requests that this Court admit all of the evidence proffered by the Debtor at the TRO hearing.

Respectfully submitted,

Dated: January 1, 2024

/s/Thomas W. Coffey
Thomas W. Coffey (0046877)
Coffey Law LLC
2430 Tremont Avenue
Cleveland, OH 44113
(216) 870-8866
tcoffeylaw@tcoffeylaw.com

*Proposed Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I certify that copies of the forgoing Debtor's Brief in Opposition to Admission of Debtor's Temporary Restraining Order Evidence were served upon counsel for David Handel and all other parties in interest receiving electronic service via the Court's electronic case filing system on January 1, 2024.

/s/Thomas W. Coffey
Thomas W. Coffey (0046877)

# EXHIBIT A



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**BRIEF IN OPPOSITION**
**August 15, 2023 16:55**

By: SEAN T. LAVIN 0073806

Confirmation Nbr. 2937968

DAVID HANDEL  ET AL                                          CV 23 974930

vs.

ANTHONY DAVIAN  ET AL                          **Judge:**  JOHN P. O'DONNELL

**Pages Filed:**  41

| DAVID HANDEL, | ) | CASE NO. CV 23 974930 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN P. O'DONNELL |
| | ) | |
| v. | ) | |
| | ) | **DEFENDANT'S BRIEF IN OPPOSITION** |
| ANTHONY DAVIAN, | ) | **TO PLAINTIFF'S MOTION FOR LEAVE** |
| | ) | **TO FILE AN** |
| Defendant. | ) | **AMENDED VERIFIED COMPLAINT** |

Weeks after this Court dismissed the corporate plaintiffs and their claims in the Original

Verified Complaint, Plaintiff David Handel now asks for leave to reinsert the same corporations

and their similar claims back to this lawsuit. However, because Handel had no standing to assert

the claims in the first place, he likewise does not have standing to re-add the corporate parties and

their claims under Rule 15.

Even more concerning, Handel's proposed Amended Verified Complaint changes the facts

from the Original Verified Complaint significantly. Instead of a dispute between business partners

and shareholders, Handel now believes Defendant Anthony Davian was merely employed by the

companies. These amended allegations, however, are false. In fact, Davian has uncovered evidence

that Handel kept material facts hidden from this Court and Davian.

Handel's bad faith cannot be rewarded by allowing him leave to amend the Original

Verified Complaint. It is both procedurally and substantively improper. Moreover, it prejudices

Davian and delays these proceedings even more, as the parties and this Court have expended

significant time and resources in litigating this matter. Simply put, Handel should not get a third

bite[1] at the apple and waste additional judicial resources.

---

[1] Days before he requested leave from this Court to amend, Handel filed a the Federal Verified Complaint (his second verified complaint) in the United States District Court for the Northern District of Ohio. This action remains pending.

For these reasons, and the ones that follow, Defendant Anthony Davian submits this Brief in Opposition to Plaintiff Handel's Motion for Leave to File an Amended Verified Complaint.

Respectfully submitted,

/s/ Sean T. Lavin
Sean T. Lavin (0073806)
Patrick M. Rahill (0093556)
**Flannery │ Georgalis, LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Telephone: (216) 367-2120
slavin@flannerygeorgalis.com
prahill@flannerygeorgalis.com

Counsel for Defendant Anthony Davian

## BRIEF IN OPPOSITION

Currently pending before the Court is Plaintiff David Handel's ("Handel") direct claim for tortious interference with a contract against Defendant Anthony Davian ("Davian"). That's it. This sole claim survived after the Court agreed that Handel (and now dismissed Plaintiffs Gray Matter Holdings, Inc. and Gray Data, Inc. (collectively, the "Corporate Entities")) lacked standing to bring his shareholder derivative suit against Davian.

Yet, Handel now attempts to improperly amend his Original Verified Complaint to reinsert the previously dismissed claims of the Corporate Entities. Handel lacked standing when he initially commenced this litigation, and he lacks standing now. Simply put, the Corporate Entities—who were never proper parties in this lawsuit—cannot now benefit from Civil Rule 15.

Moreover, Handel withheld critical evidence—namely, stock certificates in the name of Davian's three minor children—from Davian and this Court that shows that the proposed amended pleading is both a product of bad faith and futile.

Finally, Handel has no authority to commence this litigation on the Corporate Entities' behalf. Therefore, the Court should prevent further prejudice to Davian and his minor children (the majority shareholders) by denying Handel's Motion for Leave to File an Amended Verified Complaint.

## BACKGROUND

While this matter may be in its "procedural infancy" as Handel claims, that does not mean the parties have expended limited resources in relation to this lawsuit. Quite the contrary. This matter—and the facts contained in the Original Verified Complaint—have been heavily litigated since Handel improperly commenced the litigation in February 2023. As a brief, but necessary overview, Davian provides the following background.

## A.      Handel's Original Verified Complaint

From its commencement (and the contemporaneously granted *ex parte* Temporary Restraining Order ("TRO")), this litigation has pitted shareholders against one another: Handel (49% shareholder) against Davian (custodian of 51% shares). Handel's initial "verified" complaint brought eight claims against Davian, seven of which were for the benefit of the Corporate Entities. One claim—the sole claim that exists today—is a direct action by Handel that alleges Davian interfered in a contract between Handel and Gray Matter Holdings.

From the outset of litigation, Davian's counsel notified Handel's counsel that certain procedural requirements were not followed before commencing this lawsuit; namely, that Handel commenced a shareholder derivative suit without providing a written demand in accordance with Wyoming law. This notification came in the form of discovery requests and subsequent communications. And because of this failure to follow procedural requirements, Handel did not have standing to bring the action. Yet, Plaintiffs forged ahead undeterred.

On April 7, 2023, Davian moved to dismiss the seven claims belonging to the Corporate Entities because Handel lacked standing. Davian also argued that Handel's role as President did not grant him the authority to commence the action in the name of the Corporate Entities.

## B.      The Preliminary Injunction Hearing on Handel's Original Verified Complaint

Before the Court ruled on Davian's motion to dismiss, the Court conducted a hearing on Handel's request for a preliminary injunction. During the hearing, and seemingly out of the blue, Handel began to change the facts from his Original Verified Complaint.  Instead of a shareholder derivative suit, Handel argued that Davian had no legal interest in the Corporate Entities and was simply an employee.

Important to Handel's emerging theory of his case was Exhibit 26, a corporate stock certificate evidencing Handel's 49 shares in Gray Matter Holdings, Inc.[2] Although not produced to Davian before the hearing, Handel claimed Davian sent him this certificate via email.[3] Handel did not produce the email from Davian containing the stock certificate at the hearing. While Handel testified that other certificates may be on Slack[4] (*See* Exhibit B, page 157, lines 9-13), at the time of Handel's testimony, he had "not seen any certificates besides" Exhibit 26. (*Id.* at 156, line 155). According to Handel, he tried looking for other certificates but could not find proof of their existence. (*Id.* at 156-157).

In total, the Court heard from six witnesses over the course of a six-day preliminary injunction hearing. Ultimately, the Court held that Plaintiffs failed to satisfy their burden, denied Handel's motion for preliminary injunction, and lifted the temporary restraining order. (*See* Judgment Entry dated 6/6/2023).

### C.     The Court Dismisses a Majority of Handel's Original Verified Complaint

Rather than amend the Original Verified Complaint following the preliminary injunction hearing to reflect his new theory that Davian has no interest in the company, Handel pressed on with the litigation. Through new (and current) counsel, Baker Hostetler, Handel opposed Davian's motion to dismiss. In his opposition, Handel agreed that he had, indeed, attempted to commence a shareholder derivative lawsuit. Handel argued he made a proper demand under Wyoming law, or, if he did not, the demand should be excused. Importantly, at no time did Handel offer or suggest

---

[2] A copy of Exhibit 26 is attached to this Brief in Opposition as Exhibit A.

[3] A copy of Handel's testimony concerning the stock certificate is attached to this Brief at Exhibit B. (Apr. 19, 2023, page 155 through 159).

[4] "Slack is the productivity platform that empowers everyone with no-code automation and AI, makes search and knowledge sharing seamless, and keeps teams connected and engaged. Around the world, Slack is the platform companies trust and people love to use." About Slack, *available at* https://slack.com/about (last accessed Aug. 13, 2023).

that he amend the Original Verified Complaint. Also, Handel did not address his lack of authority as President to commence the action on the Corporate Entities' behalf.

On June 12, 2023, the Court granted, in part, Davian's motion to dismiss. In doing so, the Court relied upon the verified representations that Handel made, including the fact that "Handel owns 49% of the shares of Gray Matter Holdings, Inc." and that "Davian, as a trustee, owns or controls 51% of Gray Matter Holdings, Inc." (*See* Judgment Entry, dated 6/9/2023, filed 6/12/2023). The Court also agreed that Handel commenced a shareholder derivative action but did so without evidence of a written demand. (*Id.*). While the Court allowed Handel additional time to supplement the record with proof of the written demand, Handel could not produce a satisfactory writing. Accordingly, the Court granted Davian's motion and dismissed seven of the eight claims because Handel did not have standing to commence the litigation on the Corporate Entities' behalf.

### D. Handel Requests Leave to Amend the Original Verified Complaint

As a result of this Court's ruling, one plaintiff (Handel) and one claim (tortious interference with a contract), remained. Yet on August 1, 2023—almost six months after the filing of his initial defective Original Verified Complaint—Handel moved to amend. This followed a second "Verified Complaint" filed by Handel in the Northern District of Ohio and currently pending before the Honorable Charles E. Fleming.[5] Handel's proposed amendment reinserts previously dismissed plaintiffs (*i.e.*, the Corporate Entities) and previously dismissed claims. Indeed, Handel's proposed amended complaint contains seven claims in total, six of which belong to the Corporate Entities.

Despite the six corporate claims, the proposed amended complaint does not contain any allegations to dispel the Court's original concern—the lack of a written demand to commence a

---

[5] Davian attached a copy of the Federal Verified Complaint to his Motion for Extension, filed on August 8, 2023. To date, Davian has only opposed Plaintiffs' (the Corporate Entities) motion for temporary restraining order in the federal matter. And as of this filing, the motion for temporary restraining order remains pending.

shareholder derivative lawsuit. Instead, the proposed amendment materially changes the facts. In less than six months, Davian went from representing 51 shares of Gray Matter Holdings and dominating the day-to-day activities to a simple employee; albeit an employee who incorporated the companies, opened bank accounts, and controlled the access to corporate accounts. However, these amended "verified" facts do not represent reality.

Since Davian's improper ouster from the Corporate Entities, Handel has controlled the flow of information. Despite this lack of transparency and discovery, Davian recently uncovered evidence to support the argument that Handel's proposed Amended Verified Complaint is patently false. Although Davian has not yet had the opportunity (or the burden) to present this evidence, the evidence stems from sources Handel testified to, yet kept from Davian and this Court. Thus, for over six months, Handel and his "corporate leadership," by and through their counsel, have deliberately misled both this Court and the federal court.

Handel's abuse of the judiciary cannot be tolerated. Because Handel's proposed amended complaint fails both procedurally and substantively, the Court should deny Handel's motion for leave to amend and stop his further manipulation of the courts.

## LAW & ARGUMENT

### A. Handel's Motion for Leave to Amend Does Not Withstand Rule 15 Scrutiny.

Handel improperly seeks leave to amend his one count Original Verified Complaint to reinsert previously dismissed plaintiffs and previously dismissed claims that are not for his benefit. Although Civil Rule 15 allows courts to "freely give leave [to amend a complaint] when justice so requires," that allowance is not without limitations. Indeed, courts should deny requests like Handel's—requests where the moving party displays "bad faith" or causes "undue delay, or undue prejudice to the opposing party." *Hoover v. Sumlin*, 12 Ohio St.3d 1, 5 (Ohio 1984). Moreover,

courts should deny amendments that would be "futile" because of their inability to withstand scrutiny under other rules of civil procedure. *See Demmings v. Cuyahoga Cty.*, 2013-Ohio-499, ¶¶ 9, 11 (8th Dist. 2013) (quoting *Perrin v. Bishop*, 1993 WL 497054 (8th Dist. Dec. 2, 1993)).

Here, Handel's request under Rule 15(A) is both procedurally and substantively improper. First, a plaintiff who did not have standing to assert original claims cannot amend a complaint to reassert claims he likewise has no standing to assert. With his Amended Verified Complaint, Handel seeks to reinsert the Corporate Entities into the litigation and again bring claims on their behalf. But those claims were never properly before this Court, and Handel has not addressed the Court's fundamental concerns about standing. Simply, Handel is unwilling, or unable, to bring derivative claims, so he attempts to backdoor jurisdiction with this Court by pretending he has the authority to direct the Corporate Entities to bring these claims in the first instance.

Second, even if Handel could bring the corporate claims contained in the Amended Verified Complaint, the claims lack merit. First, the Amended Verified Complaint displays a complete disregard for this Court's time and resources, which displays Handel's bad faith prosecution of this lawsuit. Second, the Amended Verified Complaint would prejudice Davian as he has expended significant resources in defending this litigation so far. Third, the Amended Verified Complaint is futile, as it would not withstand a motion to dismiss. This is again due to Handel's lack of authority to commence litigation on the Corporate Entities' behalf. And finally, should the Court grant leave to amend, numerous issues of conflict arise which hinder current counsels' representation of the Corporate Entities.

For these and the reasons that follow, the Court should deny Handel's Motion for Leave to File an Amended Verified Complaint.

## B. Handel's Proposed Amendment is Procedurally Improper Because He Does Not Have Standing.

Handel, individually, cannot use Rule 15 to amend the Original Verified Complaint. As the Court properly determined in its dismissal order,[6] Handel did not have standing to commence the lawsuit on the Corporate Entities' behalf. A plaintiff who does not have standing to assert a claim against a defendant does not have standing to amend the complaint and control the litigation by substituting new plaintiffs or a new cause of action. *Bhandari v. Cadence Design Systems, Inc.*, 485 F. Supp. 2d 747, 750 (E.D. Texas 2007)[7]; *see also Fed. Home Loan Mortg. Corp. v. Schwartzwald*, 979 N.E.2d 1214, 1222 (Ohio 2012) ("[T]he Rules of Civil Procedure do not extend the jurisdiction of the courts of this state, and a common pleas court cannot substitute a real party in interest for another party if no party with standing has invoked its jurisdiction in the first instance"); *Shefkiu v. Worthington Indust., Inc.*, 15 N.E.3d 394, 399 (Ohio App. 6th Dist. 2014) ("Therefore, [the plaintiff] cannot now rely on the Rules of Civil Procedure to extend the trial court's jurisdiction by bringing in the [real party in interest] as an additional plaintiff when [the original plaintiff] lacked standing in the first instance"); *Summit Office Park, Inc. v. Steel Corp.*,

---

[6] The Court's Order dismissing seven of the eight claims in the Original Verified Complaint does not indicate whether the dismissal was with or without prejudice. In similar situations involving a lack of written demand, courts have suggested that dismissal with prejudice is particularly appropriate in the context of shareholder derivative complaints. *See White v. Panic*, 783 A.2d 543, 555-56 (Del. 2001). Properly enforced, this policy would:

> Encourage[] the plaintiffs to investigate their claims *before* filing a complaint so that they have a basis at the outset to make particularized factual allegations in the complaint. In contrast, if plaintiffs were granted lave to amend deficient complaints as a matter of course…plaintiffs would have a reduced incentive to ensure that their original complaints are complete from the start.

*Id.*; *accord MacKoul v. Birbara*, 185 N.E.3d 926 (Mass. App. 2022) (holding that a dismissal for lack of standing in a derivative suit is an adjudication on the merits warranting a dismissal *with prejudice* because a lack of standing is fatal to the merits of the claims) (applying Massachusetts law, which, like Wyoming, follows the Model Business Corporation Act). As such, the Court's prior dismissal should be seen as one **with prejudice** to prevent exactly what Handel attempts to do here: amend a prematurely filed lawsuit with different facts that fit Handel's theory of the day.

[7] "Because the Ohio Rules of Civil Procedure are modeled after the Federal Rules of Civil Procedure, federal law interpreting the federal rule is appropriate and persuasive authority in interpreting a similar Ohio rule." *Felix v. Ganley Chevrolet, Inc.*, 49 N.E.3d 1224, 1230 (Ohio 2015); *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 529 N.E.2d 449, 462 (Ohio 1988) (explaining that Ohio Rule 15 was patterned after the analogous federal rule).

639 F.2d 1278, 1282 (5th Cir. 1981) ("where a plaintiff never had standing to assert a claim against the defendants, it does not have standing to amend the complaint and control the litigation by substituting new plaintiffs…and a new cause of action").

Due to Handel's premature commencement of this litigation, the Court never had jurisdiction over the Corporate Entities' claims. All the Court could properly consider is Handel's direct claim against Davian. Yet, Handel now seeks to amend that Original Verified Complaint to reassert the Corporate Entities as parties and claims that are for the Corporate Entities' benefit. The Court properly determined that Handel lacked standing at the outset of the litigation to bring these claims, and the same remains true now. Attempts to change the facts and theories supporting standing are not only improper, but, as discussed below, reflect Handel's bad faith in prosecuting this litigation.

Therefore, because Handel did not have standing at the outset to commence litigation on the Corporate Entities' behalf, Handel cannot now rely on Rule 15 to remedy that issue to Davian's detriment.

### C. Handel's Proposed Amendment is Substantively Improper.

Despite this Court properly dismissing his shareholder derivative claims for failing to satisfy statutory mandates before commencing corporate litigation, Handel remains intransigent, now attempting to "replead the facts" before this Court. However, the amended facts brought before this Court are patently false, prejudicial, and ultimately futile. The Court should not tolerate Handel's bad faith.

Electronically Filed 08/15/2023 16:55 / BRIEF / CV 23 974930 / Confirmation Nbr. 2937968 / CLAJB

i. *Handel brings his proposed amended complaint in bad faith.*

Handel's concealment of key facts demonstrates his bad faith in prosecuting claims related to this matter.[8] What constitutes "bad faith" can be difficult to define. But courts have generally believed that bad faith imports some sort of dishonest purpose. *See State ex rel. Bardwell v. Cuyahoga Cty. Bd. of Comm'rs.*, 2010-Ohio-5073, ¶ 8 (2012) (bad faith "imports a dishonest purposes or some moral obliquity"); *Hoover*, 12 Ohio St.3d at 7; *Jontony v. Colgrove*, 2012-Ohio-5846, ¶ 92 (8th Dist. Dec. 10, 2012) (Conway-Cooney, J., dissent) (bad faith can be reflected by a party "hiding facts or defenses" from the other party); *see also* Black's Law Dictionary, defining "bad faith" as "dishonest of belief or purpose". In *U.S. ex rel. Nicholson v. MedCom Carolinas, Inc.*, the Fourth Circuit upheld a district court's finding of bad faith where: (1) the plaintiff withheld facts and evidence he knew; (2) the plaintiff asserted claims that he knew he had no standing to bring; and (3) the plaintiff changed substantive facts from one complaint to the next in order to avoid dismissal. 42 F.4th 185, 198-200 (4th Cir. 2022). Here, like in *Nicholson*, Handel (1) withheld facts and evidence he knew existed on Slack; (2) as discussed above, asserted claims he knew he did not have standing to assert; and (3) changed the substantive facts from the Original Verified Complaint to the Amended Verified Complaint to avoid dismissal. This abuse of Rule 15 should not be tolerated.

Handel's bad faith is exemplified by his testimony surrounding his stock certificate introduced at the preliminary injunction hearing and subsequent facts uncovered by Davian. At the injunction hearing, Handel testified that the stock certificate he introduced as Exhibit 26 "came from Slack" even though he received it via email.[9] (Exhibit B, page 156, lines 1-5; page 157, lines

---

[8] This bad faith extends to the Corporate Entities' Federal Verified Complaint against Davian.

[9] Handel has not produced this email to either the Court or Davian, despite Davian's initial request for production of all communications with Davian.

9-13). Handel also claimed that he "tried" to recover other certificates from Slack, even though he had "not seen any certificates besides" Exhibit 26. (*Id.* at 155, line 25; page 156, line 1-5). At the time, Davian took Handel at his word; indeed, Davian was in the dark and believed he could not access the corporate records to verify.

With the control of information in his favor, Handel now seeks to replead the facts to better suit his position. The relevant allegations in the Amended Verified Complaint now assert:

> 5.      Plaintiff David Handel owns one hundred percent (100%) of issued Shares of Gray Matter Holdings.

> 14.      Pursuant to the bylaws of Gray Matter Holdings, actual proof of ownership of shares is required.[10]

> 17.      Accordingly, Handel holds a stock certificate for forty-nine (49) shares of Gray Matter Holdings. (P.I. Hearing, Exhibit [26],[11] Handel Stock Cert.).

> 18.      Plaintiffs have no evidence that Gray Matter Holdings shares were ever issued to Davian or that Davian ever held shares that could be gifted to his three children.

> 19.      Despite numerous opportunities since Plaintiffs filed the Initial Complaint, Davian has failed to provide any proof that a stock certificate for shares in Gray Matter Holdings was ever issued to him. Indeed, he has not produced a copy of any stock certificate properly issued in his name in response to discovery requests served prior to the hearing on Plaintiffs Motion for Preliminary Injunction ("Hearing") or as evidence at the Hearing itself.

> 20.      Handel owns forty-nine (49) of Gray Matter Holdings' one hundred (100) total shares. ***The other fifty-one (51) shares have never been issued and remain with Gray Matter Holdings.***

(Amended Verified Complaint, ¶¶ 5, 14, 17-20) (emphasis added).

---

[10] Paragraph 14 continues on to represent certain requirements stated in Gray Matter Holdings' bylaws. These representations are likewise false.

[11] Handel incorrectly references Exhibit 25 in his Verified Complaint. Exhibit 25 was withdrawn at the hearing and not introduced into evidence. Davian believes Handel means Exhibit 26.

These assertions are deliberately misleading. Through further investigation, Davian recently recovered the data contained on Slack. Upon doing so, Davian learned the following:

- On Friday, April 14, 2023—five days before the preliminary injunction hearing—Handel logged into the Corporate Entities' Slack channel. Later that same day, at 4:48 PM, counsel for Handel produced what would become Exhibit 26 to Davian as GMHI – 001609.

- Upon doing so, Handel would have seen a channel on Gray Matter Holdings' Slack account titled "#orgpaper." Davian created this channel on April 2, 2018. That same day, Davian uploaded organizational documents, including a PDF titled "ledger.pdf." This "ledger.pdf" indicates that the shareholders of Gray Matter Holdings, Inc. are (1) "AD"; (2) "AJD"; (3) "DD";[12] and (4) David Handel.

- Besides Davian, both "Tim H" and "David" joined the #orgpaper channel on April 2, 2018. "David" refers to David Handel, with an email d@graymattergr.com. Records reflect that Handel had been a member of the Slack group since March 28, 2018.

- Importantly, on April 21 and 22, 2018, the following documents were uploaded to the #orgpaper channel:

  o A stock certificate certifying that "AD" is the owner of 17 shares of common stock of Gray Matter Holdings, Inc. ("Certificate One").

  o A stock certificate certifying that "AJD" is the owner of 17 shares of common stock of Gray Matter Holdings, Inc. ("Certificate Two").

  o A stock certificate certifying that "DD" is the owner of 17 shares of common stock of Gray Matter Holdings, Inc. ("Certificate Three").

  o A stock certificate certifying that David Handel is the owner of 49 shares of common stock of Gray Matter Holdings, Inc. ("Certificate Four").

  o Certificate Four was later VOIDED due to internal inconsistencies, namely, the number of shares in the upper-right hand corner did not match the issued number of shares in the body of the certificate. That error was corrected and a fifth certificate was issued certifying that David Handel is the owner of 49 shares of common stock of Gray Matter Holdings, Inc. ("Certificate Five").

(Davian's Affidavit, Exhibit C, and attachments thereto). On April 19, 2023—day one of the preliminary injunction hearing—Handel introduced Certificate Four as Exhibit 26. This exhibit

---

[12] In accordance with Local Rule 39(C)(2)(b), the names of Davian's minor children have been redacted in both this Brief and the attached Exhibits. Upon request, Davian can produce unredacted versions to the Court.

was belatedly produced in discovery before the hearing. However, Certificates One, Two and Three were never produced. These are material facts that should have been disclosed to this Court by Handel when this case was first filed, and certainly during the pendency of the injunction hearing when the parties, and this Court, were inquiring. For Davian to have to have to unearth these documents on his own, while Handel skips from courthouse to courthouse with ever changing "verified complaints," is unconscionable.

It appears Handel hid facts from Davian and this Court. By accessing Slack days before the hearing, Handel put himself in a position to uncover facts that supported the allegations in his Original Verified Complaint—that Gray Matter Holdings issued 100 shares and that Davian's children collectively owned 51 of those shares. But these facts—the truth about the corporate ownership—did not comport with Handel's evolving narrative. (*See also* Exhibit B, page 155, line 25: "I have not seen any certificates besides [Exhibit 26]"). And now with his Amended Verified Complaint, Handel seeks to further obfuscate the real facts supporting this matter, verifying instead that "Handel owns forty-nine (49) of Gray Matter Holdings' one hundred (100) total shares. ***The other fifty-one (51) shares have never been issued and remain with Gray Matter Holdings***." (Amended Verified Complaint, ¶ 20) (emphasis added).

Handel's deliberate bad faith and gamesmanship cannot be rewarded by allowing him to amend the Original Verified Complaint. And even if Handel did not intentionally suppress these facts, the omission of this evidence calls into question any "exhaustive" investigation Handel and his counsel conducted into this matter. (*See* Amended Verified Complaint, ¶ 13 "Following Davian's termination, Plaintiffs undertook a more exhaustive investigation of corporate records. This investigation revealed several important facts that necessitate Plaintiffs filing this Amended

Verified Complaint"). For these reasons, the Court should deny Handel leave to amend the Original Verified Complaint.

ii.    *Handel's proposed amended complaint prejudices Davian.*

Moreover, granting Handel leave to amend the Original Verified Complaint would prejudice Davian. The primary consideration in denying a motion for leave to amend is whether there is prejudice to the opposing party. *City of Dublin v. Friedman*, 2017-Ohio-9127, ¶ 60 (10th Dist. 2017) ("Prejudice to an opposing party is the most critical factor to be considered in determining whether to grant leave to amend") (citations omitted). A "spectre of prejudice" arises "when a plaintiff requests leave to amend their complaint ***after*** a defendant has filed a motion to dismiss." *Carter v. University Park Dev. Corp.*, 2017-Ohio-5795, ¶ 12 (9th Dist. 2017) (emphasis added). This makes sense, because a moving party's "reasonable diligence" in moving for the amendment is a factor in the prejudice analysis. *See WBCMT 2007-C33 Office 7870, LLC v. Breakwater Equity Partners, LLC*, 2019-Ohio-3935, ¶ 15 (1st Dist. 2019) *Friedman*, at ¶ 60 ("Timeliness of the request is another factor to consider").

Here, Handel waited until ***after the Court's decision*** on Davian's motion to dismiss to seek an amendment of the Original Verified Complaint. Before that: i) Handel obtained the *ex parte* TRO; ii) the parties participated in expedited discovery, exchanging 1000s of documents; iii) Davian filed his motion to dismiss and notified Handel of the procedural issues; and iv) the parties participated in the six-day hearing, where Handel asserted many of the facts he now asserts in the Amended Complaint. Instead of amending his complaint after the hearing, Handel forged ahead and opposed the motion to dismiss.Ultimately, Davian was successful on everything, as the Court denied the motion for preliminary injunction and dismissed the derivative claims from the lawsuit.

In litigating these issues, Davian has incurred significant expenses in the form of attorney fees, court costs and other litigation related costs, not including undue strain on his time and mental fortitude. Indeed, Davian has moved for attorney fees under Wyoming law. By granting Handel's request for leave at this time, the Court would render the significant procedural history in this case moot. As such, waiting until now, especially when Handel's theory had changed in mid-April, prejudices Davian. *See Franciscan Communities, Inc. v. Rice*, 2021 WL 2013017, *9 (Ohio App. 8th Dist. May 20, 2021) ("The failure to timely file a motion to amend based on evidence in the movant's possession constitutes undue delay, and the court has discretion to deny amendment of a pleading in those circumstances").

Furthermore, allowing Handel to amend the complaint would only further delay this litigation and Davian's rightful place as majority representative of the company. Handel has used this litigation and the lifted TRO to keep Davian in the dark on corporate actions since Davian's ouster. Moreover, as discussed above, Handel has likely kept relevant facts hidden from Davian and this Court. Finally, when Davian began to take back control over the Corporate Entities, Handel both refused to participate in those procedures and initiated the federal litigation that deals with the same underlying concern as this case – control over the Corporate Entities.

In his motion for leave, Handel downplays the significant litigation history that has already occurred here:

> Despite the extensive hearing on Plaintiffs' Motion for Preliminary Injunction, this case is still in its procedural infancy. Limited discovery has been exchanged and no depositions have been scheduled or taken. Thus, the amendment will neither cause any delay in the proceedings nor any prejudice to Defendants.

Electronically Filed 08/15/2023 16:55 / BRIEF / CV 23 974930 / Confirmation Nbr. 2937968 / CLAJB

(Handel's Motion for Leave to File an Amended Verified Complaint, page 2). Handel then cites three cases to support his groundless belief that no prejudice will fall upon Davian. But like his arguments and proposed amendment thus far, Handel's caselaw does not support his position.

Take, for example, both the *Checkpoint* and *ASAP Technical* cases Handel cites. Both cases involved plaintiffs ***narrowing*** the issues by amending the complaints ***to remove*** needless causes of action. *See Checkpoint Sys., Inc. v. Hangzhou Century Co., LTD.*, 2012 WL 2159257, *5 (N.D. Ohio June 13, 2012); *ASAP Tech. Servs., Inc. v. Nalepka*, 1995 WL 106141, *3 (Ohio App. 8th Dist. Mar. 9, 1995). Handel's Amended Verified Complaint does just the opposite – it ***adds*** two corporate plaintiffs, six corporate actions, and a ***expands*** the issues for this Court's consideration. Handel does this without even addressing the Court's fundamental concern, that Handel even has the authority to commence the litigation on the Corporate Entities' behalf. Plainly then, *Checkpoint* and *ASAP Technical* do not support Handel's position.

Neither does *Campbell*. In that case, the appellate court found no prejudice befell the defendant from plaintiffs' decision to amend the complaint ***two weeks after defendant filed his motion to dismiss***. *See Campbell v. Aepli*, 2007-Ohio-3688, ¶ 47 (5th Dist.). Moreover, the plaintiffs in *Campbell* simply sought to supplement the record to address their procedural miscue. *Id.* at ¶ 6. Handel's Amended Verified Complaint, on the other hand, is different in both timing and substance. First, Handel waited until ***after*** the Court dismissed the corporate causes of action. This is true even though the Court provided Handel additional times to supplement the record to address the procedural miscue. Ultimately, Handel had repeated opportunities to advise this Court that he had not met the written demand requirement, but he concealed that fact. And second, Handel's Amended Verified Complaint ***changes the substance*** of the allegations, rather than simply

correcting past procedural mistakes. Again, *Campbell* does not support Handel's request for leave to amend the complaint.

At base, Handel's "let's-see-what-the-judge-does-on-the-motion-to-dismiss-the-original-verified-complaint-first,-and-then-move-to-amend-later" is pure gamesmanship and should not be tolerated. *See Johnston v. Box*, 453 Mass. 569, 574-75 (Mass. 2009) (upholding the denial of plaintiff's motion for leave to amend his shareholder derivative lawsuit). Handel's actions have already delayed proceedings significantly and have caused, and will continue to cause, prejudice to Davian. Accordingly, the Court should deny Handel's motion for leave to amend the Original Verified Complaint.

### iii. *Handel's proposed amended complaint is futile.*

Handel's Amended Verified Complaint is futile as it would not withstand a motion to dismiss. The Court's dismissal of the Original Verified Complaint's derivative causes of action stemmed from Handel's lack of standing to commence the shareholder derivative lawsuit. Likewise, here, even if Handel had standing (which he does not), he lacks the authority to commence further litigation as completed by the Amended Verified Complaint.

Under the Amended Verified Complaint, Handel's authority to commence this litigation stems from one of two sources: (1) the belief that he "owns one hundred percent (100%) of issued Shares of Gray Matter Holdings;" or (2) the fact that he "is the President and Chief Executive Officer of Gray Matter Holdings and Gray Data." (Amended Verified Complaint, ¶ 5). Either source of authority is a nonstarter.

First, as demonstrated above, Handel's ownership of "100% of issued shares" is patently false. Moreover, it is nonsensical to believe that an owner of a corporation would only issue 49

shares in his company—and risk dilution of his majority interest—instead of a controlling amount. Handel's verified allegation makes no sense in theory or reality.

Nor does Handel's role as President and CEO, at the time of filing, give him the authority to commence this litigation. Putting aside the fact that Handel previously ignored this potential source of authority when opposing Davian's motion to dismiss, Handel's belief reflects a fundamental misunderstanding of corporate governance.

Wyoming vests the general powers of a corporation—the power to sue and be sued, complain, and defend in its corporate name, *see* Wyo. Stat. § 17-16-302(a)(i)—with the corporation's board of directors. Wyo. Stat. § 17-16-801(b). Thus, a company's board of directors controls the corporate actions, unless limited by the company's bylaws or a shareholder agreement. *Id.* The powers of a company's president, on the other hand, are limited to those expressly contained in the corporation's bylaws or other controlling documents. Wyo. Stat. § 17-16-841; *see also Woods v. Wells Fargo Bank Wyoming*, 90 P.3d 724, 732-33 (Wyo. 2004) ("A corporation's bylaws and resolutions adopted by the board of directors determines the extent of a president's authority").

Accordingly, the board of directors possess complete authority over the corporation, unless that authority is specifically delegated to an officer of the corporation, like the president. That authority also includes the ability to commence litigation. *Woods*, 90 P.3d at 732-33 (citing *Chun v. Board of Trustees*, 952 P.2d 1215, 1226 (Haw. 1998)). Thus, "absent **express delegation** of the corporate directors' authority to control the decision whether to conduct litigation on the corporation's behalf…***no one else may legitimately exercise that authority***." *Id.* (emphasis added).

Handel has argued elsewhere[13] that "because the bylaws do not expressly reserve authority to file suit to the board of directors, as President, Handel is presumed to have the authority to commence this litigation on behalf of [the Corporate Entities]." This assertion does not comport with Wyoming statutory law. Rather, the president's role is limited, needing express delegation of authority. *See* Wyo. § 17-16-841; *Woods*, 90 P.3d at 732-33. Similarly, the board's powers are expansive and do not need to be reserved in the company's governing documents. *See* Wyo. Stat. §§ 17-16-302; 17-16-801(b). Again. Handel misunderstands the general nature of corporate authority.

Turning to the bylaws then, Handel did not have the authority to commence litigation as the President of Gray Matter Holdings—a company "engage[d] in the business of cryptocurrency data mining." (Amended Verified Complaint, ¶ 9). Gray Matter Holdings' Bylaws[14] state the following:

| 2018 Bylaws | The President has "general supervision of the Corporation's affairs" and shall "perform all other duties as are incident to the office or are properly required of him or her by the Board of Directors." <br><br> Article 5, § 5.2. |
|---|---|
| 2021 Bylaws | The President "shall have general and active management of the business of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect." <br><br> Article 3, § 5. |

---

[13] In federal court, the same issues of control over the Corporate Entities are at issue. *See Gray Data, Inc., et al. v. Davian, et al.*. Case No. 1:23-cv-01470-CEF, Doc. 15, PageID: 296.

[14] There are two sets of bylaws at issue: one dated from the company's inception in February 2018, produced by Davian (the "2018 Bylaws"); and one produced by Handel and subsequently identified as being sourced from 2021 (the "2021 Bylaws"). The 2021 Bylaws were attached to the Original Verified Complaint as Exhibit 2; the 2018 Bylaws were introduced as Exhibit N at the preliminary injunction hearing.

The Wyoming Supreme Court's decision in *Woods* is illustrative here. There, the Court faced a similar bylaw section governing a president's authority:

> The president 'shall in general supervise and control all of the business and affairs of the corporation' and 'in general shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Directors from time to time.'

*Woods*, 90 P.3d at 733. After reviewing this section, the *Woods* court determined that these provisions "must be construed in context." *Id.* Specifically, the *Woods* court sought to answer "[w]hether the initiation of litigation is in the ordinary course of business" for the corporation at issue. *Id.* (citing *Keogh Corp. v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 827 F. Supp. 269, 272 (S.D.N.Y. 1993)). After determining that the corporation—a residential construction business— was not generally engaged in the settlement of litigation, the *Woods* court determined that the president did not have the authority to settle litigation on the corporation's behalf. *Id.*

Likewise, here "the initiation of litigation" is not within either Gray Matter Holdings or Gray Data's "ordinary course of business." Instead, the Corporate Entities "engage in the business of cryptocurrency data mining." (Amended Verified Complaint, ¶ 9). Thus, Handel cannot rely on the Bylaws grant of "general supervision" or "general and active management" of the Corporate Entities affairs as authority to initiate litigation seeking the ouster of Davian. Rather, that decision must come from the Corporate Entities' board of directors, which would order Handel to engage in such action.

Handel has no standing to assert corporate causes of action against Davian. He also possesses no authority to commence this litigation on the Corporate Entities' behalf without board of directors' delegation. Similar to the filing of his Original Verified Complaint, Handel disregards procedural requirements and expects this Court to just look the other way. Thus, Handel's proposed

Amended Verified Complaint is futile for the same underlying reason the Court previously dismissed the corporate causes of action—Handel cannot bring the claims he wants to bring.

### D. Handel's Counsel Cannot Represent Both the Corporate Entities and Handel Moving Forward

Finally, should this matter proceed as Handel's proposed amendment suggests, Handel's current counsel cannot move forward as the counsel for the Corporate Entities. It is axiomatic that a corporation's counsel represents the interests of the corporation—not the individual officers. Prof. Cond. R. 1.13(a). And while certain exceptions exists, counsel should not represent two different parties with conflicting interests. *See id.* at 1.7.

Davian will address this argument further in a separate motion should the Court grant Handel's motion for leave. But for now, it is clear—based on Handel's bad faith discussed above— that counsel's representation of Handel individually has hindered their ability to represent the Corporate Entities' interests at the same time. From the outset of this litigation, Davian has repeatedly asserted his interests in the Corporate Entities. But counsel's blind reliance on Handel has stifled any pursuit of the Corporate Entities' separate interests. Indeed, the thoroughness of counsels' investigations on the Corporate Entities' behalf, either by Mansour Gavin pre-suit, or Baker Hostetler's alleged investigation pre-motion for leave to amend the complaint, are now central issues in this dispute.

Lastly, while Davian has yet to respond to the allegations contained in this litigation, his investigation to date reflects the likelihood that the Corporate Entities will have legal claims against Handel. Davian conducted a board meeting to address these concerns. Handel, through the same counsel that purports to represent the Corporate Entities, refused to participate.

Accordingly, counsel are conflicted from representing the Corporate Entities and Handel moving forward.

# CONCLUSION

The Court should no longer tolerate Handel's misuse of the judiciary. He did not have standing to assert the derivative claims in the Original Verified Complaint and he does not have standing to assert the corporate claims in the proposed Amended Verified Complaint. Moreover, Handel's assertions are made in bad faith and brought to further prejudice Davian. Even if the Court could look past these arguments, Handel's request for leave should be denied because the Amended Verified Complaint is futile for the same reasons as the Original Verified Complaint was – Handel's lack of authority to commence litigation on the Corporate Entities' behalf.

Accordingly, Davian respectfully asks this Court to deny Handel's Motion for Leave to File the Amended Verified Complaint.

Respectfully submitted,

/s/ Sean T. Lavin
Sean T. Lavin (0073806)
Patrick M. Rahill (0093556)
**Flannery │ Georgalis, LLC**
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
Telephone: (216) 367-2120
slavin@flannerygeorgalis.com
prahill@flannerygeorgalis.com

Counsel for Defendant Anthony Davian

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2023, a copy of the foregoing Defendant's Brief in Opposition to Plaintiff's Motion for Leave to File an Amended Verified Complaint was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ *Sean T. Lavin* _____
Sean T. Lavin

*Attorney for Defendants*



# STOCK CERTIFICATE

Gray Matter Holdings Inc.

**DEFENDANTS' EXHIBIT A**
CV 23 974930

certificate number

4

number of shares

17

Corporate Name

Incorporated in: Wyoming

has a total authorized amount of ___100___ shares, at ___$0.01___ par value.

This is to certify that ___David Handel___ is the owner of ___49___ shares of ___Common___ stock of the above named corporation, which are non-assessable, fully paid shares. The transfer of these shares must be done in accordance with the by-laws of the named corporation, in person, or by a duly appointed attorney or officer of the named corporation, and recorded in the books of the corporation.

/s/ David Handel

_____     _____     _____
President                          Secretary                          Treasurer

For _____ received, I, _____ sell and transfer _____ shares, of the _____ shares represented by this certificate to _____

and appoint _____ the _____, to record this transfer in the corporate books.

_____          _____          _____
Name of shareholder              Signature of shareholder                    Witness
                                                                                          Signature and name

if sold:

DEFENDANTS'
EXHIBIT

B

CV 23 974930

1   sent to myself, so this is from him.

2   Q.      We'll have to turn to some of the exhibits

3   that your counsel walked you through and ask you some

4   questions.

5   A.      Out of the binder?

6   Q.      Yes.  Out of the white binder.

7           If you could turn to what was marked as

8   Plaintiff's Exhibit 26.  Do you see that?

9   A.      I do.

10  Q.      This is the stock certificate for Gray Matter

11  Holdings Inc.?

12  A.      Correct.

13  Q.      Certifies that David Handel is the owner of 49

14  shares of common stock.  Do you see that?

15  A.      Correct.

16  Q.      You also see, sir, in the upper left-hand

17  corner of the stock certificate, it has a section

18  called certificate number?

19  A.      I do.  Yes.

20  Q.      What is the number above the certificate

21  number line?

22  A.      Four.

23  Q.      Are you aware of at least three other

24  certificates that were issued?

25  A.      I have not seen any certificates besides this.

```
 1    We've actually -- we tried to recover where the other
 2    ones were because they're apparently on Slack when we
 3    used Slack which was ages ago, and they only keep
 4    records for -- I think it was 90 days on free
 5    accounts.
 6    Q.    You would agree with me that this stock
 7    certificate is numbered number four?
 8    A.    Yes.
 9              THE COURT:         May I interrupt
10         you, Mr. Lavin?
11              MR. LAVIN:         Yes, sir.
12              THE COURT:         Are you saying
13         that you know one, two, and three did exist at
14         one point but they're on Slack and now
15         essentially deleted, or are you saying if they
16         existed that's where they were?
17              THE WITNESS:         This was found
18         -- are you asking me or him?
19              THE COURT:         The question to
20         you was basically do you know what happened to
21         numbers one, two, and three.  First of all,
22         did certificates one, two, and three ever
23         exist to your knowledge?
24              THE WITNESS:         I have no idea.
25              THE COURT:         Okay.
```

Electronically Filed 08/15/2023 16:55 / BRIEF / CV 23 974930 / Confirmation Nbr. 2937988 / CLAJB

```
 1              THE WITNESS:        This was --
 2              THE COURT:          So I got that
 3         answer.
 4              Now the next question is, if they did
 5         exist and this is really the fourth of four or
 6         more, would one, two, and three have been on
 7         Slack and therefore now inaccessible to
 8         anybody?
 9              THE WITNESS:        Yeah.  Because
10         the way I found this was Anthony e-mailed it
11         to me and then in the e-mail it said the rest
12         are on Slack, or this is from Slack, or
13         something mentioning Slack.
14              THE COURT:          He sent that to
15         you post litigation, or back in the day?
16              THE WITNESS:        Back in the day,
17         yeah.
18              THE COURT:          I interrupted
19         you.
20              MR. LAVIN:          It's fine, your
21         Honor.
22    BY MR. LAVIN:
23    Q.    Mr. Handel, if you turn your attention to the
24    upper right-hand corner of the stock certificate.
25    A.    Yep.
```

OFFICIAL COURT REPORTERS

```
 1   Q.     It says number of shares.

 2   A.     Yep.

 3   Q.     Do you see that?

 4   A.     I do.

 5   Q.     What is the number written above number of

 6   shares?

 7   A.     17.

 8                    THE COURT:          Did I hear 70 or

 9          one-seven?

10                    THE WITNESS:        One-seven.

11                    THE COURT:          Pardon me.

12   BY MR. LAVIN:

13   Q.     On the certificate, Mr. Handel, it certifies

14   that you have 49 shares, correct?

15   A.     Correct.

16   Q.     In the upper right-hand corner it says 17

17   shares.

18   A.     Correct.

19   Q.     Earlier in your verified complaint you

20   identified Mr. Davian as custodian of 51 percent

21   shares, correct?

22   A.     Upon information and belief at that time.

23   Q.     You're aware, sir, are you not, that

24   Mr. Davian was the custodian for the shares of his

25   three minor children?
```

Electronically Filed 08/15/2023 16:55 / BRIEF / CV 23 974930 / Confirmation Nbr. 2937968 / CLAJB

1   A.    We have never found official documents proving
2   that, stating that, showing that. We haven't found
3   trust documents. We asked him for trust documents.
4   We have not gotten any sort of trust documents or
5   documentation relating to the trust.
6   Q.    We'll get into that a little later, but is it
7   fair to say, Mr. Handel, that upon information and
8   belief, it's understood that Mr. Davian represented
9   himself as being a 51 percent shareholder in the
10  interest of his kids, his three minor children?
11  A.    Yes. Anthony claims that there's a trust for
12  the kids.
13  Q.    Very good.
14        If each child had equal shares of that 51
15  percent, would you agree with me that they have 17
16  shares?
17  A.    The math would make sense, yes.
18  Q.    Mr. Handel, if you turn for me what was marked
19  as Plaintiff's Exhibit 13.
20  A.    Go ahead.
21  Q.    More specifically, if you would turn to
22  Bates-numbered page GMHI 000968.
23  A.    Go ahead.
24  Q.    Earlier you were shown this document and you
25  testified that it reflects only your 49 shares?

Electronically Filed 08/15/2023 16:55 / BRIEF / CV 23 974930 / Confirmation Nbr. 2937968 / CLAJB

DEFENDANTS'
EXHIBIT

**C**

CV 23 974930

STATE OF OHIO      )     SS: Affidavit of Anthony J. Davian, Sr.
COUNTY OF CUYAHOGA   )

Anthony J. Davian, Sr., being first duly sworn, avers and states as follows:

1.  I am over 18 years of age and competent to testify as to all matters stated herein.

2.  All statements contained in this affidavit are based upon my personal knowledge of the facts stated herein.

3.  I am the custodian of 51% of the shares in Gray Matter Holdings, Inc. ("Gray Matter") as well as an officer and director of the company. David Handel ("Handel") is the 49% shareholder in Gray Matter. Following a properly noticed and held shareholder and board meeting on July 31, 2023, which Handel did not participate in, Matthew Kluger is a director of the company.

4.  Following the incorporation of Gray Matter in February 2018, the company began to use a messaging app designed for businesses called Slack. Slack's website is www.slack.com. Slack was used by the company from February 2018 through approximately November 2021.

5.  Slack allowed me, Handel, and Tim Hock ("Hock"), the company's bookkeeper at the time, to share communications and documents related to the company.

6.  During the preliminary injunction hearing held in *Handel, et al. v. Davian, et al.*, Case No. CV-23-974930, Handel testified about the company's use of Slack.

7.  In working with counsel to respond to Handel's motion for leave to amend the complaint, on August 8, 2023, I recalled that I had signed up for Slack with my personal e-mail address from 2018, bnkblecle@gmail.com. I was then able to access documents communications that were posted by me, Handle and Hock in 2018.

8.  Some of the documents I was able to obtain were the stock certificates issued to Handle and my three minor children (A.D., A.J.D., and D.D.) on April 21, 2018.

Attached to this affidavit is Stock Certificate Number 1 in the name of A.D. (Exhibit A); Stock Certificate Number 2 in the name of A.J.D. (Exhibit B); Stock Certificate Number 3 in the name of D.D. (Exhibit C); and Stock Certificate Number 5 in the name of Handel ("Exhibit D").

9. Stock Certificate Number 4 was also in the name of Handel, but was voided because of an error on the document that incorrectly identified Handel as having only 17 shares in the upper right corner.

10. This Certificate was voided on or about April 22, 2018, and a new Certificate (Number 5) was issued. Attached to this affidavit is Stock Certificate Number 4 in the name of Handel that was voided. (Exhibit E).

11. Handel testified that he received an e-mail from me attaching the Stock Certificate Number 4, but no email has been produced to me, and ever since Handel received the *ex parte* TRO against me, I have been denied access to company records and e-mails.

12. Also found on Slack is the "Gray Matter Holdings, Inc. Share Holder Ledger," posted to Slack on April 2, 2018. A copy of the Ledger is attached at Exhibit F. This ledger accurately contains the distribution of shares reflected on the Stock Certificates.

13. The Access Logs to Slack show that on April 14, 2023 at 9:28AM, Handel accessed the company's Slack account platform from an Android device, IP address 185.156.46.167 (Ashburn, VA - just outside Washington, D.C. - near Dulles International Airport). The first day of this Court's preliminary injunction hearing began on April 19, 2023.

14. Despite accessing Slack on April 14, 2023, Handel did not provide me with the attached Stock Certificates. Nor did Handel, through his counsel, inform me or this Court that access to the Slack documents was possible.

2

Electronically Filed 08/15/2023 16:55 / BRIEF / CV 23 974930 / Confirmation Nbr. 2937968 / CLAJB

15. Had I been given access to Slack prior to the preliminary injunction hearing, the attached exhibits and other documents would have been used by me to defeat Handel's spurious accusations.

16. Instead, as a result, I have had to spend significant amounts to defend these allegations.

17. On August 14, 2023, the company's board of directors executed a Unanimous Written Consent of Directors in Lieu of a Meeting. A copy of this Written Consent is attached hereto as Exhibit G. As contained therein, Handel was terminated as President of the company effective immediately. Additionally, the attorney-client relationship between the company and the law firms of Mansour Gavin LPA and Baker Hostetler were terminated.

FURTHER AFFIANT SAYETH NAUGHT

Anthony J. Davian, Sr.

SWORN TO BEFORE ME and subscribed in my presence this 15th day of August, 2023.

Notary Public, State of Ohio

**Susan M Voigt**
Notary Public
In and For the State of Ohio
My Commission Expires
September 26, 2024

3

# STOCK CERTIFICATE

Gray Matter Holdings Inc.

EXHIBIT

A

Davian Affidavit

certificate number: 1

number of shares: 17

**Corporate Name**

Incorporated in: Wyoming

has a total authorized amount of A.D. 100 shares, at $0.01 par value.

This is to certify that A.D. is the owner of 17 shares of Common stock of the above named corporation, which are non-assessable, fully paid shares. The transfer of these shares must be done in accordance with the by-laws of the named corporation, in person, or by a duly appointed attorney or officer of the named corporation, and recorded in the books of the corporation.

_____
President

/s/ David Handel
_____
Secretary

_____
Treasurer

For _____ received, I, _____ sell and transfer _____ shares, of the _____ shares represented by this certificate to _____

_____ the _____

and appoint _____ to record this transfer in the corporate books.

_____
Name of shareholder

_____
Signature of shareholder

_____
Witness
Signature and name

If sold:

EXHIBIT

**B**

Davlan Affidavit

# STOCK CERTIFICATE

certificate number

2

number of shares

17

Corporate Name

Gray Matter Holdings Inc.

Incorporated in: Wyoming

has a total authorized amount of _____ 100 _____ shares, at _____ $0.01 _____ par value.

This is to certify that _____ AJ D█████ _____ is the owner of _____ 17 _____ shares of _____ Common _____ stock of the above named corporation, which are non-assessable, fully paid shares. The transfer of these shares must be done in accordance with the by-laws of the named corporation, in person, or by a duly appointed attorney or officer of the named corporation, and recorded in the books of the corporation.

_____
President

_/s/ David Handel_
_____
Secretary

_____
Treasurer

For _____ received, I, _____ sell and transfer _____ shares, of the _____ shares represented by this certificate to

and appoint _____ the _____, to record this transfer in the corporate books.

Name of shareholder

_____
Signature of shareholder

_____
Witness
Signature and name

If sold:



# STOCK CERTIFICATE

Gray Matter Holdings Inc.

**EXHIBIT C**

Davian Affidavit

certificate number

3

number of shares

17

## Corporate Name

Incorporated in: Wyoming ,

has a total authorized amount of _____ 100 _____ shares, at _____ $0.01 _____ par value.

This is to certify that _____ is the owner of _____ 17 _____ shares of _____ Common _____ stock of the above named corporation, which are non-assessable, fully paid shares. The transfer of these shares must be done in accordance with the by-laws of the named corporation, in person, or by a duly appointed attorney or officer of the named corporation, and recorded in the books of the corporation.

_____ President

_____ /s/ David Handel
Secretary

_____ Treasurer

If sold:

For _____ received, I, _____ sell and transfer represented by this certificate to

_____

and appoint _____ the _____ , _____ to record this transfer in the corporate books.

_____ shares, of the _____ shares

_____ Name of shareholder

_____ Signature of shareholder

_____ Witness
Signature and name



# STOCK CERTIFICATE

**Gray Matter Holdings Inc.**

EXHIBIT
D
Davian Affidavit

certificate number

5

number of shares

49

Corporate Name

Incorporated in: Wyoming

has a total authorized amount of 100 shares, at $0.01 par value.

This is to certify that David Handel is the owner of 49 shares of Common stock of the above named corporation, which are non-assessable, fully paid shares. The transfer of these shares must be done in accordance with the by-laws of the named corporation, in person, or by a duly appointed attorney or officer of the named corporation, and recorded in the books of the corporation.

/s/ David Handel

_____
President

_____
Secretary

_____
Treasurer

if sold:

For _____ received, I, _____ sell and transfer _____ shares, of the _____ shares represented by this certificate to _____

and appoint _____ the _____, to record this transfer in the corporate books.

_____
Name of shareholder

_____
Signature of shareholder

_____
Witness
Signature and name



EXHIBIT
F
Swan Affiant

## Gray Matter Holdings Inc. Share Holder Ledger

| Name of Stockholder | Place of Residence | Certificate # | # of shares | Date Issued | From Whom Shares Were Transferred | Amount Paid Thereon | Date of Transfer of Shares | To Whom Shares Were Transferred | Certificate # of Certificates Surrendered | # of Shares Surrendered | Number of Shares Held (Balance) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| D | Ohio | 1 | 17 | 02.28.18 | Original issue | $0.01 | | | | | 17 |
| J E | Ohio | 2 | 17 | 02.28.18 | Original issue | $0.01 | | | | | 17 |
| E | Ohio | 3 | 17 | 02.28.18 | Original issue | $0.01 | | | | | 17 |
| David Handel | Washington DC | 4 | 49 | 02.28.18 | Original issue | $0.01 | | | | | 49 |
| Total | | | 100 | | | $1.00 | | | | | 100 |



49% 17% 17% 17%

Electronically Filed 08/15/2023 16:55 / BRIEF / CV-23-974930 / Confirmation Nbr. 2937968 / CLAJB

## Share Holder Ledger for Gray Matter Group Inc.

| Name of Stockholder | Place of Residence | Certificate # | # of Shares | Date Issued | From Whom Shares Were Transferred | Amount Paid Thereon | Date of Transfer of Shares | To Whom Shares Were Transferred | Certificate # of Certificates Surrendered | # of Shares Surrendered | Number of Shares Held (Balance) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gray Matter Holdings Inc. | Wyoming | 1 | 100 | 03.01.2018 | Original Issue | $0.01 | | | | | 100 |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| Total | | | 100 | | | $1.00 | | | | | 100 |

DocuSign Envelope ID: 66B8E9F1-DF6C-4D1B-ACDE-9F66317E2E24

## UNANIMOUS WRITTEN CONSENT OF DIRECTORS

## IN LIEU OF A MEETING OF THE BOARD OF DIRECTORS

## - OF GRAY MATTER HOLDINGS INC. -

The undersigned, being all the directors of Gray Matter Holdings Inc., a Wyoming corporation (the "Corporation"), do hereby consent to the adoption of the following resolutions by written consent, without a meeting of the Board of Directors of the Corporation:

BE IT THEREFORE RESOLVED, that David Handel be terminated for cause as President of the Corporation effective immediately;

FURTHER RESOLVED, that Marc Behar be terminated for cause as "Chief Operating Officer*" of the Corporation effective immediately;

FURTHER RESOLVED, that Anthony James Davian Sr. be appointed President effectively immediately;

FURTHER RESOLVED, that Matthew Kluger be appointed Secretary effective immediately;

FURTHER RESOLVED, that the President terminate any legal relationship between the Corporation and Mansour Gavin LPA and BakerHostetler;

FURTHER RESOLVED, that the President investigate the basis and authority under which these law firms were retained and compensated;

FURTHER RESOLVED, that the President retain Frantz Ward as corporate litigation counsel;

FURTHER RESOLVED that the President withdraw litigation enacted by the former President immediately;

IN WITNESS WHEREOF, the undersigned have executed this Written Consent as of the 14th day of August 2023.

_____
Anthony James Davian Sr. | President | Director | CEO

DocuSigned by:

_____
Matthew Kluger | Secretary | Director | CCO